The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Lorrie L. Dollar and the briefs and arguments by the parties on appeal. Additionally, by Order of Commissioner Thomas J. Bolch, Assistant Attorney General Brent D. Kiziah was permitted to file an Amicus Curaie brief on behalf of the University of North Carolina and the University of North Carolina Hospitals. This brief was also considered by Full Commission in its determination of this matter. Based upon their assignments of error, defendants have failed to show good ground to receive further evidence or to amend the holding of the Deputy Commissioner. Based upon her assignments of error, plaintiff has also failed to show good ground to receive further evidence or to amend the holding of the Deputy Commissioner. However, pursuant to its authority under G.S. 97-85, the Full Commission has modified in part and affirmed in part the Deputy Commissioners decision and enters the following Opinion and Award.
 ***********
On 24 July 2000, plaintiff filed a Motion for Enforcement, Sanctions and Late Payment Penalty. Defendants timely responded in opposition to plaintiffs motion. On 5 September 2000, the Commission filed a preliminary Order denying plaintiffs Motion. Having now reviewed the motion and this matter in its entirety, the Full Commission RESCINDS the 5 September 2000 Order and shall address the issue of potential overdue payments of compensation in this Opinion and Award.
Additionally, before the Full Commission, Plaintiffs Guardian Ad Litem
filed a Motion for appointment of Francisco J. Bricio as an Interim Trustee for Receipt and Disbursement of Compensation on 15 September 2000. Defendants filed a Response in opposition to this motion on 21 September 2000. On 27 September 2000, the Commission sent correspondence to the parties rejecting plaintiffs proposal and requesting further input at the time of oral arguments. Having now reviewed the motion and this matter in its entirety, and for good cause shown, the Full Commission hereby APPOINTS Pamela R. DiStefano as an Interim Trustee for Receipt and Disbursement of Compensation.
 ***********
Originally, the hearing caption in this case included the North Carolina Growers Association as a party-defendant. On 14 September 1999, attorney Kathryn P. Fagan filed a Motion to Dismiss the Growers Association from this claim. By Order filed on 14 September 1999, the North Carolina Growers Association was dismissed as a party-defendant from this action.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement which was filed on 18 May 1999 and at the hearing of that same date as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act at all relevant times.
2. Companion Property Casualty was the carrier on the risk.
3. An employee-employer relationship existed between the parties at all relevant times.
4. Maria Theresa Palmer was appointed Guardian Ad Litem for plaintiff by the Industrial Commission on 13 January 1998.
5. The alleged incident occurred on 10 July 1998, and plaintiff has been unable to work since that date.
6. The issues for determination are:
a. Did plaintiff sustain an injury by accident on 10 July 1998, and if so, to what benefits may he be entitled under the Act?
b. Did defendant-employer willfully fail to comply with a safety regulation?
c. What is plaintiffs average weekly wage?
d. Did defendants defend this claim without reasonable grounds?
7. The parties stipulated the following exhibits into evidence:
a. I.C. Forms 18, 19, 61 (2 forms), 22, 33 and 33R;
b. National Climatic Data Center Reports for Fayetteville and Clinton, North Carolina, four pages (marked as Plaintiffs Exhibit 21);
c. Defendants Responses to First Set of Interrogatories and Request for Production, six pages (marked as Plaintiffs Exhibit 6);
d. Defendants Responses to Second Set of Interrogatories and Request for Production, four pages (marked as Plaintiffs Exhibit 25);
e. Deposition and Exhibits of N.C. Department of Labor, Agricultural Health Safety,
f. Medical Reports:
1. Sampson County Rescue and EMS, three pages;
2. Sampson Regional Medical Center, nineteen pages;
3. UNC Hospitals, three hundred and thirteen pages;
g. Videotape of plaintiff (marked as Plaintiffs Exhibit 16);
h. Life Care Plan by Dr. Cynthia L. Wilhelm, sixteen pages (marked as Plaintiffs Exhibit 20);
i. Employment Records, twenty-seven pages.
8. The following additional exhibits were received into the record:
a. Plaintiffs Exhibit 18, Weekly Time Sheet for Tores, six pages,
b. Plaintiffs Exhibit 19, Weekly Time Sheet for Tovar, six pages,
c. Plaintiffs Exhibit 22, Plaintiffs Request for defendants to Supplement Interrogatories, three pages,
d. Plaintiffs Exhibit 23, 19 October 1998 letter from defendants, and
e. Plaintiffs Exhibit 28, National Climatic Data Monthly Station Normals for North Carolina, thirty-two pages.
 ***********
Based upon the entire record of evidence, the Full Commission enters the following:
 FINDINGS OF FACT
1. Since September of 1981, W. Brent Jackson has operated a farm and warehouse corporation, Jacksons Farming Company. W. Brent Jackson was the corporate president, his wife Debbie Jackson served as secretary-treasurer, and their son Rodney Jackson was vice president and general manager.
2. By 1998, Jacksons Farming Company maintained five to six hundred acres in production by triple cropping, or planting crops on the acreage over the spring, fall and winter growing seasons. The farm produced tomatoes, eggplants, cantaloupes and watermelons. In July 1998, defendant-employer had approximately six acres of staked tomatoes to be harvested.
3. Rodney Jackson joined the North Carolina Growers Association (NCGA) in 1998 in order to be eligible to participate in the U.S. Department of Agricultures H2A Program. The H2A program prescreens migrant farm workers to provide them with a temporary visa and place them as farm laborers in the United States during the growing season.
4. To qualify as an H2A farm, defendant-employer was required to maintain workers compensation insurance, which it did. Defendant-employer would also have to meet OSHA standards for farm laborers. In addition, the NCGA requires an employer to provide housing, take water samples, and take workers to town for groceries and supplies and to have cold drinking water and portable toilets within 1/4 mile of the farm operation for the workers.
5. On 23 March 1998, the North Carolina Department of Labor Agricultural Safety and Health Officer performed the federally mandated pre-occupancy inspection for defendant-employers facilities. During the course of the inspection, defendant-employer was given a "Heat Stress/Heatstroke poster and working conditions were reviewed.
6. Before arriving at defendant-employers migrant farm camp, NCGA showed farm workers videotape about safety and heat which was in Spanish.
7. Plaintiff was born on 16 July 1961. On 19 June 1998, plaintiff was a thirty-six year old male native of Mexico with a second grade education. He arrived for work at defendant-employers farm through the H2A Program. Defendant-employer had twenty workers who unloaded watermelons, carried fruit, picked tomatoes, and worked in the warehouse. The workers were paid $6.16 per hour for their work.
8. Defendant-employer kept water in the fields for the workers to drink when they wanted; however, single use cups were not always available, and often the workers used a common cup.
9. At the time of the incident giving rise to this claim, Juan Rico had worked for defendant-employer for approximately four years as the supervisor for the migrant workers. He brought the water to the work site and let workers know where they would be working each day. Mr. Rico speaks Spanish and is able to converse with the workers.
10. The laborers used 5/9 size buckets to pick pink and red vine-ripened tomatoes. Each bucket held twenty to twenty-five pounds of tomatoes. A worker would pick a bucket full of tomatoes, carry the bucket to the trailer where it was emptied so that the tomatoes could then be graded and packed.
11. On 10 July 1998, the workers took a break from noon to 1:00 p.m. After this break, Debbie Jackson and a crew of workers picked and packed tomatoes. Mrs. Jackson was stationed on the trailer of the truck, packing the tomatoes which the workers picked. Workers came to the trailer to unload their buckets of picked tomatoes and to get water.
12. Because Mrs. Jackson did not speak Spanish, Juan Rico directly supervised the work crew. At approximately 5:30 p.m., Mrs. Jackson observed a group of workers standing at a row and sent Mr. Rico to investigate. A worker told Mr. Rico that plaintiff was sick. However, plaintiff told Mr. Rico he was just a little dizzy. Mrs. Jackson continued to pack tomatoes and the workers continued to pick tomatoes. Other than offering plaintiff some cold water, no first aid was administered. Plaintiff sat at the end of a row until the workers completed picking the last of the tomatoes.
13. After completion of the days work, two coworkers helped plaintiff walk to the camp and they laid him outside on a sheet because he was unable to walk unassisted. At approximately 5:50 p.m., Mr. Rico told Brent Jackson that plaintiff was ill. Brent Jackson radioed Rodney Jackson, who was in another field. Rodney Jackson went to the camp and called back to report that plaintiff was down and to call the rescue squad. Inexplicably, at no time after receiving notice of his illness did defendant-employer place plaintiff in its nearby air conditioned office or in the nearby produce cooler. Eventually, at approximately 6:10 p.m., Brent Jackson called the EMS.
14. Soon thereafter Rodney Jackson called back to inform Brent Jackson that plaintiff was unconscious, and Brent Jackson called EMS a second time at 6:15 p.m.
15. Plaintiff had been picking tomatoes for approximately three hours in direct sunlight in ninety to ninety-five degree heat and humidity of thirty-seven to forty-five percent when he began to feel ill.
16. Emergency medical care arrived at 6:38 p.m. and left to transport plaintiff to Sampson Regional Medical Center by 6:48 p.m. They arrived in the emergency department at 7:16 p.m., where Dr. Michael J. Rosenberg, a board certified internal medicine physician and professor at UNC, evaluated plaintiff. According to the history given to the doctor, plaintiff had been picking tomatoes for about twelve hours and it was unknown as to whether he had any water to drink. An examination revealed a temperature in excess of 108 degrees Fahrenheit, which was the highest reading on the thermometer, discs were flat and pupils were in the mid position. Plaintiff was put in ice and by 9:21 p.m., he was diagnosed with heatstroke and discharged in critical condition and transferred to UNC Hospitals.
17. During September and October of 1998, R. Lee Kiser, a second year resident in internal medicine at UNC Hospital, attended plaintiff. Based upon the history of plaintiffs illness, ambient body temperature in excess of 108 degrees, loss of responsiveness, hemodynamic instability, decreased urine output, subsequent multi-organ system failure and the weather conditions, plaintiff was diagnosed with impending exertional heatstroke and massive and irreversible brain damage due to cerebrovascular accident resulting in coma.
18. On 22 October 1998, plaintiff was discharged from the hospital with a diagnoses of heatstroke, possible persistent vegetative state, cerebral infarction, intracerebral hemorrhages, acute respiratory distress, history of aspirations, history of acute renal failure, history of rhabdomyolysis, cardiac arrest, myocardial infarction, shock, and pneumonia. These conditions were caused by the heatstroke on 19 June 1998.
19. Plaintiff was then transferred to Central Hospital in Mexico under the care of Dr. Ricardo Castro. Plaintiffs family has since taken him to their home in San Luis Potosi.
20. Since his heatstroke, plaintiff has been, and will continue to be dependent upon others for his care.
21. Plaintiffs employment with defendant-employer caused or significantly contributed to his heatstroke and exposed him to an increased risk of having a heatstroke as compared to members of the general public not so employed.
22. A life care plan is necessary to evaluate plaintiffs present and future needs as a result of a catastrophic condition such as heatstroke. Although Cynthia L. Wilhelm, Ph.D., prepared a life care plan based upon a review of plaintiffs medical records, this plan is incomplete. Dr. Wilhelm did not travel to Mexico to evaluate plaintiffs home circumstances and was not familiar with the medical facilities which may be in the vicinity of plaintiffs home. Therefore, specific findings can not be made with respect to renovations which may be necessary to plaintiffs dwelling or specific medical and durable supplies and equipment.
23. While plaintiff would benefit from placement in a brain injury facility, there is insufficient evidence in the record on which any specific finding may be made of whether an appropriate facility is available for plaintiff.
24. A complete, current and comprehensive life care plan would be beneficial in this case in order to assist the parties to evaluate whether it would be better to transfer plaintiff to a brain injury facility, if a suitable one can be located, or whether the defendants should renovate plaintiffs home and acquire suitable care and equipment for the home. As plaintiff will continue to require around the clock care, this plan shall include a determination of whether members of plaintiffs family and/or qualified professionals in his community should be designated as attendant caregivers. Without a complete life care plan, the Full Commission is unable to make a specific finding regarding the most appropriate manner in which to provide for plaintiffs care.
25. Plaintiff will require nursing care on a twenty-four hour basis for the remainder of his life. He will also require follow-up care from a physiatrist or internist, neurologist or neuropsychiatrist, urologist, gastroenterologist, psychologist, dentist, dietician, and physical therapists, and the services of a medical case manager. Whether these services are provided at plaintiffs home or at a brain injury facility is not addressed in this Opinion.
26. Plaintiff will require durable and routine medical equipment, including but not limited to appropriate cushions to prevent the development of decubitus, a hospital bed and mattress, a bed table, a hydraulic lift, a wheelchair, bed pads, bathing equipment and supplies, gloves, Attends, catheter and supplies, GI tube supplies, splints, portable ramps and a handicapped-accessible van. Plaintiff will also require ongoing prescription medications as may be ordered by his authorized treating physicians or specialists called in to consult on his case from time to time. However, plaintiff may not require the van or ramps if he is placed in an inpatient facility.
27. Plaintiff may require architectural renovations to his home, including installation of reliable electricity, air conditioning, running water, and a telephone. As no life care planner or other expert has traveled to plaintiffs home to evaluate the exact needs, the Full Commission is unable to make specific findings as to the exact requirements needed to make plaintiffs dwelling handicap-accessible at this time.
28. Defendants failed to timely file the Form 19 despite actual knowledge of the incident on 19 July 1998.
29. Despite actual knowledge of plaintiffs heatstroke, defendants did not deny compensability for this case until 18 August 1998. At that time, the carrier filed a Form 61, on which compensability was denied on the basis that defendant-employer had fewer than ten regular employees. While Adjuster Nancy Spinella agreed that plaintiff had a heatstroke on 10 July 1998 and was performing duties as a farm laborer by picking tomatoes at the time of the heatstroke, a second Form 61 was filed on 28 August 1998 which listed as the basis for denial that plaintiff did not sustain a compensable injury by accident arising out of and in the course and scope of his employment.
30. In operating a migrant labor camp under the H2A program, defendant-employer agreed to subscribe federal OSHA standards. Pursuant to this agreement, 29 CFR 1910.142(k) (1) and (2) require adequate first aid facilities approved by a health authority to be maintained and made available in every labor camp for the emergency treatment of injured persons. Defendant-employer failed to provide the OSHA mandated first aid training and training for supervisory personnel to recognize heatstroke symptoms and, therefore, willfully violated OSHA safety requirements. As a result of this failure, Debbie Jackson and Juan Rico were unable to recognize the seriousness of plaintiffs symptoms or to obtain early first aid and cooling techniques which may have lessened the severity of plaintiffs heatstroke.
31. Plaintiffs average weekly wage could not be calculated from the Form 22 as submitted. As inadequate information was otherwise given by defendants, the fair method of determining plaintiffs average weekly wage is to utilize the figure supplied on the Form 19 by defendant-employer, as this sum is equivalent to a calculation of plaintiffs hourly wage by the regular number of hours anticipated to be worked. Therefore, plaintiffs average weekly wage, monetary salary only, on 10 July 1998 was $372.00 per week. To this is added $50.00 per week in lodging benefits, for a total of $422.00 as an average weekly wage. This yields a compensation rate of $281.35 per week.
32. Deputy Commissioner Dollars Opinion and Award was filed on 22 February 2000. From that Opinion and Award, both plaintiff and defendant appealed. However, no appeal was filed regarding, nor were any errors assigned to the findings that plaintiff sustained a compensable injury and was entitled to permanent and total disability benefits. Therefore, the first installment of compensation became due ten (10) days from the day following expiration of the time for appeal from Deputy Commissioner Dollars Opinion and Award. To date, defendants have paid no compensation to plaintiff and payments are overdue.
33. Lucia Wilbending was present in the courtroom from 10:00 a.m. until 5:00 p.m. to provide translation services.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs average weekly wage on 10 July 1998 was $422.00, yielding a compensation rate of $281.35. G.S. 97-2(5).
2. Because defendant-employer purchased workers compensation insurance as a condition of participation in the H2A program, it is subject to and bound by the provisions of the North Carolina Workers Compensation Act. G.S. 97-13(b) ("any employer without regard to number of employees, including an employer of . . . farm laborers . . . who has purchased workers compensation insurance to cover his compensation liability shall be conclusively presumed during the life of the policy to have accepted the provisions of this Article from the effective date of said policy and his employees shall be so bound. . . .
3. Plaintiffs employment with defendant-employer caused or significantly contributed to his heatstroke and exposed him to an increased risk of having a heatstroke as compared to members of the general public not so employed. G.S. 97-53(13).
4. As a result of his occupational disease, plaintiff is entitled to be paid by defendants permanent and total disability compensation at the rate of $281.35 per week for the period of 10 July 1998 and continuing for the remainder of his life. G.S. 97-29.
5. Defendant-employers willful violation of OSHA safety requirements entitles plaintiff to be paid by defendants an amount equal to ten percent (10%) of the total disability benefits he is entitled to as compensation. G.S. 97-12. This ten percent (10%) amount is considered to be "compensation under the Act for the purposes of calculating the attorneys fee approved herein. Id.; G.S. 97-90.
6. Plaintiff is entitled to be paid by defendants an additional amount equal to ten percent (10%) of the total disability benefits which are now overdue pursuant to the terms of G.S. 97-18(e) and G.S. 97-18(g). This additional ten percent (10%) amount is considered to be "compensation under the Act for the purposes of calculating the attorneys fee approved herein. Id.; G.S. 97-90.
7. As a result of his occupational disease, plaintiff is entitled to have defendants pay for medical expenses incurred. G.S. 97-2(19); G.S.97-25; G.S. 97-25.1. This shall include the formulation of an accurate life care plan which encompasses an actual assessment of plaintiffs home for the purpose possible architectural renovations, a determination of whether an appropriate brain injury facility is available and beneficial to plaintiff and, as plaintiff will continue to require around the clock care, this plan shall include a determination of whether members of plaintiffs family and/or qualified professionals in his community should be designated as attendant caregivers. Id. Should attendant care be provided by members of plaintiffs family and/or qualified professionals in his community, these caregivers will be entitled to be paid by defendants an appropriate fee for their services. Id.
8. The approval of attorneys fees based upon a percentage of the compensation paid to plaintiff is limited to indemnity compensation and penalties and sanctions added to such compensation, but does not include expenses related to medical care and treatment. See, e.g., Hyler v. GTEProducts Co., 333 N.C. 258, 425 S.E.2d 698 (1993); G.S. 97-90.
9. Defendants denial of plaintiffs claim on 18 July 1999 upon jurisdictional grounds, when in fact defendant-employer had specifically purchased workers compensation coverage for its farming operation, was unreasonable and based upon stubborn, unfounded litigiousness. G.S.97-88.1. Accordingly, plaintiff is entitled to have defendants pay the attorneys fee approved herein which are based upon a percentage of the indemnity compensation due plaintiff and the penalties and sanctions added to such compensation. Id.
10. Because of their failure to timely file an Industrial Commission Form 19 Report of Injury, defendants are subject to a fine of $25.00. G.S. 97-18(h).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies in part and affirms in part the Deputy Commissioners holding and enters the following:
 AWARD
1. Defendants shall pay to plaintiff total disability compensation at the rate of $281.35 per week for the period of 10 July 1998 and continuing for the remainder of his life. As much of said compensation as has accrued shall be paid in a lump sum to plaintiff.
2. Defendants shall pay to plaintiff an amount equal to ten percent (10%) of the total disability benefits awarded to plaintiff as compensation as a penalty for their willful violation of OSHA safety requirements. As much of said compensation as has accrued shall be paid in a lump sum to plaintiff.
3. Defendants shall pay to plaintiff an additional amount equal to ten percent (10%) of the total disability benefits which are now overdue pursuant to the terms of G.S. 97-18(e) and G.S. 97-18(g). Having accrued, this amount shall be paid to plaintiff in a lump sum.
4. A reasonable attorneys fee of twenty-five percent (25%) of the compensation awarded to plaintiff in paragraphs 1, 2 and 3 above is hereby approved to be paid directly to counsel for plaintiff by defendants as a sanction pursuant to G.S. 97-88.1. Thereafter, an amount equivalent to every fourth check shall continue to be paid directly by defendants to counsel for plaintiff as a sanction pursuant to G.S. 97-88.1.
5. Defendants shall pay for all related medical expenses incurred by plaintiff as the result of his occupational disease. This shall include the formulation of an accurate life care plan which encompasses an actual assessment of plaintiffs home for the purpose possible architectural renovations, a determination of whether an appropriate brain injury facility is available and beneficial to plaintiff and, as plaintiff will continue to require around the clock care, this plan shall include a determination of whether members of plaintiffs family and/or qualified professionals in his community should be designated as attendant caregivers. Should attendant care be provided by members of plaintiffs family and/or qualified professionals in his community, defendants shall pay these caregivers an appropriate fee for their services.
6. Defendants shall pay a fine of $25.00 to the Commission as the result of their failure to timely file an Industrial Commission Form 19 Report of Injury pursuant to G.S. 97-18(h).
7. Defendants shall pay the costs, including the expert witness fees as follows:
a. Bruce Holt, R.N., $170.00;
b. R. Lee Kiser, M.D., $250.00;
c. Roger C. Jensen, Ph.D., $100.00;
d. Michael J. Rosenberg, M.D., $500.00;
e. Cynthia L. Wilhelm, Ph.D., $240.00 and
f. Translator fee of $450.00 to Lucia A. Wilbending
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/_______________ DIANNE C. SELLERS COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER